# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | |
|---|---|
| **LANA SUE STANLEY,** ) | |
| ) | |
| Plaintiff, ) | Case No. 2:08CV00061 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | By: James P. Jones |
| **COMMISSIONER OF** ) | Chief United States District Judge |
| **SOCIAL SECURITY,** ) | |
| ) | |
| Defendant. ) | |

*Pamela A. Counts and Paul L. Phipps, Lee & Phipps, P.C., Wise, Virginia, for Plaintiff; Tara A. Czekaj, Assistant Regional Counsel, and Robert Kosman, Special Assistant United States Attorney, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Lana Sue Stanley filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for a period of disability and disability insurance benefits under title II of the Social Security Act, 42 U.S.C.A. §§ 401-433 (West 2003 & Supp. 2009) ("Act"). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, this court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.*

Stanley applied for benefits on March 29, 2006, alleging disability since February 15, 2006, on the basis of bulging discs, arthritis, leg problems, spurs on her left foot, and high blood pressure. She received a hearing before an administrative law judge ("ALJ") on August 15, 2007, at which she was represented by counsel. By decision dated November 30, 2007, the ALJ found that the plaintiff was not disabled within the meaning of the Act. The Social Security Administration's Appeals Council denied review on August 29, 2008, and the ALJ's opinion constitutes the final decision of the Commissioner.

The parties have briefed and orally argued the issues, and the case is ripe for decision.

II

Stanley was forty-seven years old at the time of the hearing below. She has a high school education and previously worked as a school bus driver. Stanley has a relevant medical history that started in July of 2000, when she was diagnosed with hypertension. (R. at 165-68, 171-72.)

Stanley began seeing Janice Payne, a family nurse practitioner ("FNP"), in September of 2004, for treatment of foot pain. (R. at 263.) On December 13, 2004, Stanley was limited to driving a bus with an automatic transmission, and was "advised [to] strongly consider surgical option if pain is limiting work performance." (R. at 193.)

Payne referred Stanley to Andrew Chapman, D.P.M., of the Family Foot and Ankle Clinic in Big Stone Gap, Virginia. On November 22, 2004, Stanley visited Dr. Chapman and was diagnosed with "intermetatarsal" and treated with a "nerve block at the common plantar digital nerve at the left foot utilizing corticosteroid and a long acting local." (R. at 195.) Stanley was told to come back in three weeks for an evaluation of the treatment.

On March 2, 2005, Stanley and her husband visited Renee P. Mason, D.P.M., at the Abingdon Foot and Ankle Clinic. Stanley was unhappy with Dr. Chapman's methods of treatment, and sought treatment with Dr. Mason. Dr. Mason

recommended that Stanley wear orthotics. (R. at 299.) Stanley returned to the Abingdon Foot and Ankle Clinic on May 6, 2005, and Dr. Mason was of the opinion that Stanley's condition was clinically improving. (R. at 295.)

On December 24, 2005, Stanley returned to Payne for the treatment of lower back pain, hoarseness and coughing. Payne told Stanley to stretch and use a heating pad. Payne also prescribed Ultracet. (R. at 198.) Payne made a note that if there was no improvement in Stanley's back pain over the next three days, an MRI should be preformed. (R. at 198.) X rays preformed in early January 2006 revealed mild-multilevel spondylosis in the lumbar spine and moderate spondylosis in the thoracic spine. (R. at 228-29.)

On January 18, 2005, an MRI of the thoracic spine without an IV contrast resulted in a diagnosis of nominal central T6-T7 soft disc protrusion, multilevel spondylosis, tapering of the end plates of T11 and T12, old trauma versus developmental variant, and no marrow to indicate an acute fracture. (R. at 225.) An MRI of the lumbar spine on the same date revealed mild multilevel spondylosis with mild disk bulges and protrusions and mild left hydornephrosis. (R. at 223.)

During an office visit on February 8, 2006, Payne told Stanley she was not to sit or stand for long periods of time. Payne referred Stanley to Dominion Health and

Fitness for a physical therapy evaluation. (R at 244.) On February 14, Stanley made an initial visit for a physical therapy appointment. (R at 218-221.)

On February 22, 2006, Stanley met with FNP Janice Ewing, in the office of Gregory Corradino, M.D. Stanley was diagnosed with multilevel spondylosis and low back and left leg pain. (R. at 230-32.) Her symptoms included tenderness in the left paralumbar musculature. The tenderness did not get worse, and there was no increased muscle tone upon palpation. Stanley was also ambulatory without a limp and the ability to heel and toe walk without weakness, although tandem walking was preformed with some difficulty. (*Id.*) Stanley was given treatment options, and was ultimately referred to David Nauss, M.D., for pain management. (*Id.*)

On February 27, 2006, Stanley again saw FNP Payne seeking treatment for sinus pressure and nasal congestion. Stanley relayed to Payne that she had been to Dr. Corradino, a neurologist, and had been referred by his office to Dr. Nauss in order to receive an epidural shot. Payne again cautioned Stanley not to lift more than five pounds. (R. at 243.)

On March 2, 2006, Stanley visited Dr. Nauss at the Norton Community Hospital. Dr. Nauss decided to treat Stanley with a lumbar epidural steroid injection. The injection was scheduled for March 9, 2006, and he also discussed the possibility of facet disease and of facet injections if the steroid shot was ineffective. (R. at 236-

38.)  On March 9, Stanley received her first set of epidural shots, which helped the pain for about four days.  (R. at 235, 240.)  During a visit with FNP Payne on March 22, Stanley said that she had been unable to work since February 15, 2006, due to back pain.  She stated that raising the hood of the bus caused her pain to increase, and Payne told her to stay off of work for one month.  (R. at 240.)  The next day Stanley returned to Dr. Nauss for her second round of epidural shots.  (R. at 234.)

On April 20, 2006, Stanley went to Payne complaining of increased mid back pain over the previous three weeks.  (R. at 239).  Payne scheduled an MRI for April 26 at Johnston Memorial Hospital.  (R. at 239.)  Later in the day of April 20, Stanley received her third round of epidural shots from Dr. Nauss.  (R. at 233.)  Stanley's MRI on April 26, 2006, revealed "[m]inimal annular bulges at T6-T7 and T10-T11."  (R. at 248.)

On May 25, 2006, Stanley again visited FNP Payne.  Stanley stated that her lower back pain had slightly decreased after her third epidural, but she continued to have pain and it radiated down her left leg.  Stanley claimed to have numbness in her left great toe and reported that her left leg "falls out from under her."  (R. at 250).

On June 13, 2006, Robert McGuffin, M.D., a state agency physician, completed a disability form called a Physical Residual Functional Capacity Assessment.  (R. at 264-70.)  This assessment was completed from Stanley's available medical records.

It concluded that Stanley could "occasionally and frequently lift and/or carry ten pounds . . . stand and/or walk (with normal breaks) for a total of about six hours in an eight hour day . . . sit (with normal breaks) for a total of about six hours in an eight hour day . . . push and/or pull (including operation of hand/foot controls) unlimited, other than shown above for lift and/or carry. . . ." (R. at 265.) Dr. McGuffin also found that Stanley could preform all postural movements occasionally. Dr. McGuffin noted that "[b]ased on the evidence of record, the claimant's statements are found to be partially credible." (R. at 269.)

On June 28, 2006, Stanley returned to see FNP Payne. Her symptoms included continued lower back pain, pain in her foot, and swelling in her left leg. Because she could not pass the physical exam Stanley had decided to retire from driving a school bus. Payne felt that Stanley was depressed, and prescribed Lexpro. (R. at 274.) On July 25, Stanley returned to Payne with continuing lower back pain and depression. Stanley also complained of difficulty sleeping, stating that it was sometimes two in the morning before she could fall asleep, and that her "mind won't turn off." (R. at 271.) Payne prescribed Ambien and Lunesta to help Stanley sleep and a TENS unit to help with her pain. (*Id.*)

Stanley's application for state disability retirement was approved in a letter dated August 3, 2006. (R. at 161.) On August 14, 2006, Stanley visited Pain

Medicine Associates, P.C., in Johnson City, Tennessee. John Powell, a physician's assistant ("PA"), conducted the examination and created a treatment plan for Stanley. PA Powell felt that repeated epidurals would be "very low yield" and that Stanley's problem was "more mechanical from facet disease on the right and maybe mechanical from facet disease in the thoracic spine." (R. at 304.)

Stanley returned to FNP Payne on August 22, 2006. She claimed that her depression and anxiety had improved on Lexapro, although she was still having some crying spells and feelings of depression. Stanley also continued to complain of chronic back pain, so Payne extended her prescriptions and emphasized that Stanley should try to lose weight. (R. at 329.) On September 21, 2006, Stanley returned to Payne complaining of a shooting pain in the second toe of her left foot and stated that the pain only occurred when she wore shoes. Stanley also said she was having episodes of mental confusion and forgetfulness related to Lexapro. Payne prescribed Cymbalta to replace Lexapro. (R. at 328.)

On September 30, 2006, another state agency disability evaluation was performed. The reviewing physician, Frank M. Johnson, M.D., concurred with Dr. McGuffin's findings, except Dr. Johnson found that Stanley was limited in her lower extremities for push/pull (including operation of hand/foot controls) due to back pain. (R. at 287-93.)

On October 26, 2006, Stanley went for her initial visit to Patrick Farley, Ed.D., a licensed professional counselor. Stanley was referred to Dr. Farley by FNP Payne. Dr. Farley diagnosed Stanley as having "Major Depression, Single Episode, Mild to Moderate, [without] psychosis." (R. at 320.) Dr. Farley was waiting for Stanley's medical records to be forwarded to him, and was of the opinion that "[c]onsidering her emotional status and her medical condition (unconfirmed by medical reports) [Stanley] is unable to work at this time." (R. at 321.) Dr. Farley also recommended that Stanley come for regular counseling every two weeks, and that she remain on "psychoactive medication as per her primary care physician/nurse practitioner." (R. at 320.)

On October 30, 2006, Stanley visited W. Turney Williams, M.D., at PMA Surgical Center in Johnson City, Tennessee. Dr. Williams attempted a thoracic epidural corticosteroid injection, but due to Stanley's discomfort he decided against it. Stanley was rescheduled and on November 3, 2006, Stanley again met with Dr. Williams. Dr. Williams diagnosed "1) Thoracic spondylosis without radiculopathy; 2) Degenerative disk disease lumbar spine L4/5, L5/S1; 3) Lumbar Facet arthropathy; 4) Throchanteric bursitis; [and] 5) Moderate obesity and generalized deconditioning." (R. at 300.) Dr. Williams administered the epidural injection and also discussed the

importance of weight loss with Stanley and scheduled her for a followup appointment three weeks later. (R. at 300-01.)

On November 13, 2006, Stanley went to see Dr. Farley for counseling. Dr. Farley, using a standardized form, reported Stanley's behavior as cooperative though "slightly agitated/irritable," and her affect/mood as appropriate, depressed, and anxious. (R. at 318.) In the "flight of ideas" section, Dr. Farley wrote "focus of thinking on pain." (*Id.*) Dr. Farley reported Stanley's current Global Assessment of Functioning ("GAF")[1] as forty-five and her highest GAF for the past year as being eighty. (*Id.*) On November 14, 2006, Stanley returned to Payne saying that the injections at the pain management clinic in Johnston City had resulted in no improvement with her lower back pain. Stanley also said she had been better able to concentrate since being on Cymbalta. She also mentioned that she had seen Dr. Farley for counseling, and that they might try hypnosis at some point. (R. at 326.)

---

[1] The GAF scale is a method of considering psychological, social and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score below 50, moderate difficulty in functioning at 60 and below, some difficulty in functioning at 70 and below, and no more than slight impairment in functioning at 80 and below. Superior functioning is represented by 100. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

On December 21, 2006, Stanley returned to Dr. Farley for an hour-long counseling session. Dr. Farley's notes for this session were almost identical to the notes from the counseling session on November 13, with the one exception being his indication of memory impairment. Stanley's current GAF was again reported as a forty-five with her highest GAF in the past year being an eighty. (R. at 317.) On January 9, 2007, Stanley returned to Dr. Farley for another hour-long counseling session. The standard form was filled out in the same fashion as before, with Dr. Farley noting that Stanley had become pessimistic. Her GAF remained unchanged. (R. at 316.)

On March 10, 2007, Dr. Farley completed an evaluation of Stanley's mental capacity to work. The evaluation consisted of a checklist with places to describe and explain the findings. (R. at 308-10.)

According to the "making occupational adjustments" section, Dr. Farley rated Stanley's ability as "Fair" in the areas of following work rules, relating to co-workers, dealing with public, interacting with supervisors, and maintaining attention concentration. (R. at 308.) He rated her ability as "Poor/None" in the areas of using judgement with public, dealing with work stresses, and functioning independently. (*Id.*) In the written description for that section he stated that Stanley had "Diminished concentration, low frustration tolerance, [and] constant pain" (*Id.*)

In the "Making Performance Adjustments" section, Farley rated Stanley as "Poor/None" in her ability to "understand, remember and carry out" complex job instructions and detailed, but not complex, job instructions. (R. at 309.) He rated Stanley as "Fair" in her abilities with simple job instructions. (*Id.*) In the written description, he again noted that Stanley had "constant pain, . . ., low frustration tolerance," and that "concentration problems would negatively impact job performance." (*Id.*)

In section three, "Making Personal-Social Adjustments," Dr. Farley rated Stanley as "Fair" in her abilities to maintain personal appearance and to behave in an emotionally stable manner. (R. at 309.) He rated Stanley as "Poor/None" in her abilities to relate predictably in social situations and to demonstrate reliability. (*Id.*) His written description stated, "again, psychological symptoms will impair her ability to tolerate stresses in all social situations." (R. at 309.) Section four's written description of "Other Work-Related Activities" stated that Stanley's "concentration/medical problems . . . preclude and will negatively affect all work related activities." (R. at 310.) Dr. Farley did, however, believe that Stanley was capable of managing her own benefits. (*Id.*)

On March 16, 2007, Stanley returned to Dr. Farley for a counseling session. (R. at 315.) Dr. Farley noted that Stanley had cancelled her appointment on January

23, due to family and medical issues. He noted no change in Stanley's condition and listed her current GAF as forty-five, with her highest GAF in the past year as eighty. (*Id.*) On March 21, 2007, Stanley returned to Payne complaining that her depression was ongoing and that Cymbalta was "not enough help." (R. at 324.) Payne noted that Stanley is to have an epidural on March 30, and also changed Stanley from Cymbalta to Lexapro per Dr. Farley's recommendation. (*Id.*)

On April 19, 2007, Stanley visited FNP Payne. (R. at 323.) Stanley complained that she had suffered memory loss and insomnia as a result of taking Lexapro. Stanley claimed that she had been having increased anxiety over thoughts of getting another epidural, and that Dr. Nauss had put her to sleep in order to administer the latest injection. Stanley stated that the last epidural injection had only been effective for about a week. (*Id.*)

On May 22, 2007, Stanley, on referral from FNP Payne, visited Michael W. Bible, M.D., a rheumatologist at Blue Ridge Medical Specialists in Bristol, Tennessee. Dr. Bible diagnosed Stanley has having "chronic back strain" and "interspinous bursitis at the level of T9-10." (R. at 311-13.) Dr. Bible discussed treatment options with Stanley and elected to use trigger point injections "between the posterior spinous processes of T9-10 . . . between the posterior spinous processes of L3-4 and L4-5 . . . the erector spinae muscle on the right and at the level of T8-9

and T9-10 . . . ." (*Id.*)  Dr. Bible also instructed Stanley on some abdominal and back strengthening exercises.  (*Id.*)  On May 23, 2007, Stanley again visited Dr. Farley.  Dr. Farley listed Stanley's current GAF as forty-five, and her highest GAF in the past year as being eighty.  Dr. Farley also made a note that "[Stanley] remains unable to pursue gainful employment at this time."  (R. at 314.)

On June 19, 2007, Stanley returned to Dr. Bible for treatment.  Dr. Bible commented that Stanley "is better, but still having some pain in the lumbar area."  Dr. Bible gave Stanley two injections, one "between the posterior spinous processes of T11-12 and T12-L1" and the other in "the adjacent paraspinal muscles on the right."  (R. at 331.)  Dr. Bible also encouraged Stanley "to continue her back strengthening exercises."  (*Id.*)

On July 16, 2007, Dr. Farley completed another evaluation of Stanley's mental capacity to work.  The evaluation was identical to the March 10 evaluation with the exception of section three, the "Making Personal-Social Adjustments" section.  (R. at 332-34.) Here, Dr. Farley rated Stanley as "Good" in her ability to maintain personal appearance, and "Fair" in her abilities to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.  (*Id.*)  At this appointment, Dr. Farley also gave the opinion that Stanley met and equaled

impairment Listing 12.04 regarding affective disorders, and that she did not meet, but did equal impairment Listing 12.06 regarding anxiety.  (R. at 335.)

Dr. Farley also completed a counseling progress report for the July 16 visit. He stated that Stanley was "fearful, restless, [and] crying at times."  (R. at 336.)  Dr. Farley also remarked that Stanley was worried about an upcoming Social Security disability hearing, and that she was "visibly shaking at times."  (*Id.*)  Stanley's current GAF was listed as forty-five, and her highest GAF for the past year was listed as forty-five.  Additionally, Dr. Farley listed Stanley's condition as "Deteriorating" for the first time.  (*Id.*)

At the hearing before the ALJ on August 15, 2007, Stanley testified that even after she stopped driving a school bus, her back pain persisted (R. at 370) and that because of it, during the day she spent about six hours in total lying down on a couch; that she had no hobbies or outside activities and that her mother, who lived with her, did housework and cooking for her.  (R. at 372, 385, 387.)  She stated that her foot was "real tender" and she had "to walk on the side of her foot."  (Tr. at 378.)  She testified that "the pain has really wore me out and has really took a toll on my nerves." (Tr. at 380.)  However, she stated that because of the medication prescribed by FNP Farley, she "can tell some difference" in her mood and is not crying as much and doesn't feel "as bad." (Tr. at 383.)

Following the hearing, the ALJ referred Stanley for an independent consultative mental evaluation. Accordingly, on September 25, 2007, Stanley was evaluated by Kathy Jo Miller, M. Ed., and Robert S. Spangler, Ed.D., psychologists. In a written report of that evaluation, Miller advised that "with [Stanley's] current medications . . . her function has improved appreciably." (R. at 344.) Miller also reported that Stanley "is feeling better emotionally about herself today" and was thinking more clearly. (*Id.*) Miller went on to describe scars on Stanley's arms that were reportedly from "scratching and itching due to anxiety." (*Id.*)

In Miller's report, Stanley is described in Axis I as having "Major depression, recurrent, mild with medication and counseling." (R. at 345.) Axis III indicates, "Reported history of degenerative disc disease with chronic pain." (*Id.*) Axis IV states, "Problems relating in the social environment." (*Id.*) Miller reported that Stanley's current GAF was sixty, and her prognosis was, "Good with continued mental health intervention and medication." (*Id.*)

A form Medical Source Statement of Ability to do Work-Related Activities (Mental), was also completed by Miller. (R. at 346.) Miller was of the opinion that Stanley's impairment would have no effect on her ability to understand and remember simple instructions, carry out simple instructions, and the ability to make judgements on simple work-related decisions. Stanley's impairment would have a "moderate"

impact on her ability to understand and remember complex instructions, carry out complex instructions, and make judgements on complex work-related decisions. (*Id.*) Miller stated that Stanley "had difficulty concentrating and also remembering more than one step instructions. [Stanley] describes difficulty with day to day decisions." (*Id.*) Miller reported that Stanley's abilities to interact appropriately with the public, with supervisors, and with coworkers, had been moderately affected by her impairment. Miller also noted that Stanley's ability to "[r]espond appropriately to usual work situations and to changes in a routine work setting" has been moderately affected by her impairment. Miller wrote that "[Stanley] reports diminished capacity to function in the social/work environment." (R. at 347.)

Based on this evidence, the ALJ determined that Stanley had severe impairments consisting of "obesity;[2] degenerative disc disease; depression; and hypertension." (R. at 23.) The ALJ determined that the plaintiff was unable to return to past relevant work, but had the residual functional capacity to perform light exertional work activities, as defined in the regulations. In reliance upon the testimony of a vocational expert, the ALJ found that there existed a significant number of jobs in the national economy which the plaintiff could perform.

---

[2] The plaintiff testified that she was five feet five inches tall and weighed 260 pounds. (R. at 391.)

The plaintiff urges two grounds for overturning the Commissioner's decision. She argues that the ALJ failed to give sufficient weight to the opinions of FNP Payne and licensed counselor Farley. In opposition, the Commissioner contends that because FNP Payne was not an acceptable medical source within the meaning of the Social Security regulations, and because her opinion was disputed by qualified phsyicians, the ALJ was justified in giving Payne's opinion little weight.

Similarly, the Commisioner argues that it was within the ALJ's authority to give greater weight to the evaluation by the two consultative psychologists over the opinions of Dr. Farley, who is not a licensed psychologist.

III

It is clear that the ALJ carefully considered the evidence in reaching his decision that the plaintiff was not disabled within the meaning of the Act. While the ALJ might have decided differently based on that evidence, I cannot find that his conclusions were not supported by substantial evidence. The ALJ set forth viable reasons why he credited the opinions of certain of the medical sources and rejected others and those credibility determinations are properly left to the administrative process, based on this record.

For the foregoing reasons, the Commissioner's motion for summary judgment will be granted.

An appropriate final judgment will be entered.

DATED: March 13, 2010

/s/ JAMES P. JONES
Chief United States District Judge